Good morning, your honors. My name is Joshua Lipschutz and I want to thank the court for appointing me as pro bono counsel for appellant Mr. Morrison. In the Osborne case, the United States Supreme Court examined Alaska's post-conviction procedures and judging by the text of those procedures alone, held that they satisfied federal due process requirements. The court focused on the text alone because Osborne, quote, had not tried to use the process provided to him by the state or attempted to vindicate his liberty interest. If Mr. Osborne had availed himself of the Alaska procedures, then the question would have been whether those procedures violated recognized principles of fundamental fairness, quote, in operation. Counsel, let me ask you this. I understand the role you're playing here and it's an interesting question about 1405, but what possible benefit does DNA evidence have in this case? As I understand it, you have witnesses that saw your client arguing with the officer, wrestling with the officer, shooting the officer, that your client's driver's license was in the pocket of the deceased officer, which was a pattern that he had when he stopped people. What does DNA have to do with that? Well, a couple of responses, your honor. First of all, I would submit to the court that that particular question, although admittedly a difficult question, is not actually relevant to this appeal. In fact, addressing that question would arguably violate the Rooker-Feldman doctrine. We're not here to ask the court whether the state courts got it right in terms of granting or denying the petition. That brings me to the second point. Where is the – where in the lower court did you raise the issues that you're now raising on appeal? Well, the – so a couple of places, your honor. At ER 19, Mr. Morrison's second amended complaint in the district court. Mr. Morrison, in his pro se complaint, stated that the county of Contra Costa, refusal to release the requested crime scene evidence used to convict this plaintiff that is in their custody for DNA testing has deprived plaintiff of his liberty interests in utilizing a state procedure to obtain reversal of his conviction, and that is a denial of one's 14th Amendment right to due process. Okay. Now, you're talking about the – you're talking about habeas proceeding for a Federal District Court, right? No, your honor. This is a 1983 action challenging as a facial matter the constitutionality of Section 1405. Okay. I was getting back to the earlier – in the state court where the conviction took place. This was never raised, right? Well, no, your honor. It wouldn't have been raised in the state court because in state court, Petitioner was proceeding under Section 1405. So this proceeding – that's why I say this proceeding really is quite separate from what happened in state court. This is a facial constitutional challenge to Section 1405. And that – and there was no facial constitutional challenge below. There was a facial constitutional challenge below. There was not a facial constitutional challenge in state court. But that's not relevant to whether Mr. Morrison has standing here to raise a facial constitutional challenge. And, in fact, in raising a facial constitutional challenge, the specifics of Mr. Morrison's case, of course, as this Court knows, are quite irrelevant. The question is whether the statute categorically deprives Petitioners in Mr. Morrison's position of it. Sotomayor, with respect to Osborne, tell us precisely why we should reverse on the theory that the State statute violates Osborne. Well, your honor, the district court was certainly correct that some of the features of Section 1405 in California are, in fact, more generous than the Alaska procedures that were at issue in Osborne. But Section 1405, as it existed prior to the recent amendments that took effect this year in 2015, contained two obstacles that were not a feature of the Alaska provisions. And these obstacles have made it nearly impossible for prisoners to obtain access to DNA evidence in California. And, remarkably, those two obstacles were so significant and unworkable that the California legislature itself recently amended the statute to remove those very two obstacles and reduce the burden on prisoners. That was quite a remarkable development, frankly, even after I filed our opening brief in this case to find out that the California legislature essentially agreed with our arguments and revised the statute accordingly. When you're arguing, I suppose, that to meet those, quote, obstacles would be impossible, what's your showing in the record? Well, it's a great question, Your Honor. This case was thrown out on the motion to dismiss. And, you know, this is a situation where it may be the case that at some point down the road defendant is entitled to summary judgment on the question if they can prove, as they argue in their brief, that the statute actually does work in practice. But there has been no evidence on that because this case was thrown out at the motion to dismiss phase. And that's pretty remarkable in and of itself. You have a facial constitutional challenge where there's no standing problem. We know that Mr. Morrison has standing to challenge the constitutionality of Section 1405 because he was denied rights under that statute. There's no State action problem. And there's no question that there's a valuable liberty interest at stake here. The defendant concedes that. They say, in fact, the State brief in their, the State in their intervener brief says that the right at issue here is absolute and not waivable. So there's no question that there's a very significant liberty interest at stake. And there was a facial constitutional challenge under procedural due process requirements arguing that the procedures in practice do not allow prisoners to vindicate those very liberty interests. And you've provided some statistical analysis that you think verifies that in some way? Yes, Your Honor. I mean, granted, I've only been involved in the case at the appellate level. Right. But even just conducting a cursory investigation, we looked through the dockets of every court, every electronic docket we could find in California, and we found only three instances in which a contested Section 1405 petition had ever, has ever been granted. And if, and if even our own research shows that you're just dead wrong, what do we do with that? I believe you'd send it back to the district court for factual development. I think throwing the case out at the motion-to-dismiss stage, based on the text of the statutes alone, is inappropriate in light of the Supreme Court's admonition that if you have tried the procedures at issue, which Mr. Morrison has, then the question is whether those procedures work, quote, in practice. That's the language that the Supreme Court used. Now, they didn't conduct that in-practice analysis in Osborne because Mr. Osborne had not actually tried to use the procedures in Alaska. He was challenging the very text of the procedures. In fact, those procedures had just come into play, had just been passed. Whereas here, the statute at issue was passed almost a decade or more earlier. So we have enough evidence out there. There is enough evidence out there that we could determine whether the statute works in practice. And so throwing this out at the motion-to-dismiss stage was not the right result. Particularly on the 1405 section F-5, subsection F-5, requires that DNA testing results raise a reasonable probability that in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if the results of the DNA testing had been available at the time of conviction. And the California Supreme Court, in the Richardson case, explained that a petitioner fails to satisfy that standard if there is, quote, a substantial amount of other evidence linking the petitioner to the crime. But, of course, that will — That gets back to my initial question. How do you — how can — how do you get around Richardson in this regard when you got substantial evidence that if there were no DNA anywhere, would still have your client in a very bad spot? And again, Your Honor, I think that comes back to the nature of a — first of all, the nature of a facial constitutional challenge. We're not here to litigate Mr. Morrison's specific circumstances or whether the State court was correct to deny his 1405 petition. But you have to show, if it's a facial challenge, that there is no circumstances under which the statute works, right? That's correct. And in the — in the circumstance in which the standard is, is there substantial other evidence to link the petitioner to the crime, our submission is that there is no circumstance in which that formulation could work, because it would mean that every prisoner, essentially, would be — would be denied their 1405 rights because every — by definition, every petitioner has already been convicted beyond a reasonable doubt based on substantial other evidence. So how could you ever say that there's no substantial other evidence linking the petitioner to the crime? And that's the point. Here — so if you had a case where identity of the perpetrator was not even an issue in the case, if the question in the case was, was there a crime committed, but everybody knows what — you know, everybody agrees on who committed the acts, the only question is whether the acts constitute a crime, maybe in that circumstance it would make sense to deny a 1405 motion, because what possible circumstance could — could DNA possibly help that petitioner? That's not the case here. This was a two-month-long trial. There were dozens of witnesses that were called to testify about the identification of the perpetrator. Identification of the perpetrator was the issue at trial. There was expert testimony put on by the — by the prosecution, linked — trying to link the defendant to the crime based on gunshot residue, based on fiber analysis. Identity of the perpetrator was clearly the issue — the issue at stake in the trial. And defendant for 40 years has maintained his — sorry, my client for 40 years has maintained his innocence, arguing that he did not commit the crime. So at the point at which identity is a central argument that's taking place at trial, there's this possibility of testing evidence. The evidence is sitting in a locker. It would take a few days at most and a couple hundred dollars to test it and determine whether Mr. Morrison's theory that he didn't commit the crime has any validity whatsoever. Instead, these parties have been litigating this for a decade, a decade, to determine whether he can simply just test the evidence.  Under that penal code, by the text of that very provision, the only reason the evidence is sitting in a locker somewhere is so that it can be tested for DNA. There is no other reason to be keeping that evidence 40 years after the crime. Yet there it sits, untested, a decade after Mr. Morrison has sought to have it tested. The other — the other facial problem with Section 1405, as it existed prior to the recent amendments, is subsection F2, which is the chain of custody requirement. And again, that's a — that's a provision that the Alaska procedures did not have, so not governed by Osborne. And under Section 1405F2, a petitioner has to prove that the items sought for testing have been subject to a proper chain of custody. But how is a prisoner possibly supposed to satisfy that requirement when the information necessary to prove that requirement is all in the hands of the government? And the statute, at least prior to 2015, did not provide petitioners any mechanism for obtaining discovery on the chain of custody requirement. Now, the State, in its brief as intervener in this case, says that a petitioner can meet this requirement with, quote, police evidence storage and laboratory logs and records, or, quote, reports generated by crime scene technicians. But — but that's the very point. The prosecutor is in possession of all of that information. And in fact, the California legislature recently changed the statute to eliminate that requirement and instead make — orders the prosecutor and the police to make all reasonable efforts to obtain and provide the necessary chain of custody information. So again, the very two provisions that we challenged, the reasonable probability standard in Section F5, as well as the chain of custody standard in Section F2, were amended this year by the California legislature to make it easier for petitioners to obtain access to their DNA evidence precisely for the reasons that we identified in our brief. And I'd like to reserve the remainder of my time. You may do so, counsel. Thank you. We'll hear from the State. Or I should say the county in this case. Thank you, Your Honor. And good morning. May it please the Court, my name is Chris Whitman. I'm with the Office of the County Counsel, and I represent the Respondent, Mark Peterson, who is the district attorney for the county. In terms of our time this morning, my colleague from the Attorney General's office is here, and he has ceded his time to me just for the sake of efficiency since we have overlap in our briefs and the constitutional issues here are fully addressed in the Attorney General's brief. Counsel, why shouldn't we reamend this case in light of the amendments to the statute that the appellant argues address the very claims he makes in this case? Your Honor, there's a few reasons why reamend is unnecessary in this case. The first is the reasonable probability element, as described by appellant's counsel, bears very little resemblance to the actual element as written in 1405 and with the clarification amendments that went into place in 2015. If you look at the amendments in 2015, they didn't change any of the words of the reasonable probability standard or the materiality. What they did is that they added a clarification, and the source of this clarification was actually the Richardson case. The Richardson case was concerned that when a State court was applying 1405 and these two elements at issue here, that they might jump ahead and get involved in the ultimate issues that are part of a habeas corpus petition. For example, with the materiality requirement, the Court was concerned that if they didn't just read the question as to whether the test results would material to the identity of the perpetrator and they jumped ahead and were asking whether it would be dispositive, Richardson just wanted to make sure that that didn't happen. And the same thing went for the reasonable probability. The Court didn't want the analysis to extend to the ultimate question of innocence. And if there is any question with the Court in terms of whether the amendments were substantive or non-substantive, answering that question is not necessary here, and that is because the Richardson case was presented fully and argued on both sides prior to the first State court motion that Mr. Morrison filed. Weeks before the motion, it was briefed by the parties, and Judge Cram discussed it back and forth with the parties in terms of what Richardson meant. And I mention that because if you look at pages 1049 and 1051 of the Richardson case, that is where the legislature lifted the language out for the clarifications to the materiality and the reasonable probability elements. So whether this case were decided under the current version of 1405 and those elements or whether it was decided under the prior version, the result would be the same. And the other aspect of the 2015 amendments that Appellant's counsel discussed, these discovery provisions, these are undoubtedly new provisions in 1405. However, those procedures have always been available to judges who would resolve in 1405 motions or habeas corpus petitions. A discovery order is the simple procedure in order for the applicant for the testing to get the evidence that he needs. But again, even that is not a question that this Court need wrestle with. And that is because this was never a ground for either of the two trial courts to deny Mr. Morrison's petitions for DNA evidence. He never raised the issue of chain of custody, for example. Obviously, the grounds for the first motion hinged primarily on the reasonable probability element. But the way that the Court applied the reasonable probability element in the trial court and the State court and the way that it was addressed in the district court here mirrors the actual language of that requirement. This whole idea that there's a burden on the applicant for the DNA testing to show a substantial amount of other evidence in support of the crime, that's an apparition. And if you look at the actual text of Richardson where that quote comes from, the Court was quoting the trial court in Richardson. And if you read the quote, it goes on to say that this substantial amount of other evidence in context simply means that the trial court was applying the reasonable probability element. So again, whether the amendments were, you know, whether the case was decided in this district court with the amendments in mind or not, it would be the same result. You know, another point that was raised by Appellant's counsel is this suggestion – I mean, to the extent Your Honors find this relevant, the identity of the perpetrator at the 1974 murder trial, I don't think that's relevant here because that was never a ground for either of the two State court motions to be denied. But it really, again, is divorced from the 1974 murder trial to say that the identity of the perpetrator was the central issue or main issue. And you don't have to take, you know, my word for it or the prosecutor's word for it back then. You can just look at how Mr. Morrison's attorney argued the case. And his two defenses in closing were diminished capacity and self-defense. And he said to the jury, remember at the opening arguments when I told you I would not insult your intelligence by making arguments that you couldn't believe? He repeated that at the closing because he knew that the jury, given the 17 eyewitnesses, the damning physical evidence, the evidence of motive, that there was – it was really – it was an issue. I'll concede that it was an issue because Mr. Morrison testified it wasn't me, and I'm quoting here, it was two dudes on a motorcycle. So it was raised at trial. But if it was a significant issue, you know, I disagree with that. But again, that is not an issue that needs to be decided here because it wasn't one of the grounds for the district – excuse me, the trial courts who denied the motions. And also, you know, like many of the issues raised here on appeal by the appellant, it wasn't presented to Judge Koh in the district court. Appellant's counsel did reiterate accurately what's in the operative Second Amendment complaint, and it's nothing more than the two motions were denied in state court and due process and liberty interest. And Mr. Morrison had plenty of opportunity to inform the district court below as to what facts there were to prove up his due process allegation, whether it's facial or as applied. I mean, there are literally almost 200 pages of briefing by Mr. Morrison. So if there is any suggestion that, you know, he could amend his complaint to actually state a facial as applied challenge, you know, there's no evidence of that in the court below. The other issue I'd like to address is the notion that this chain of custody issue, this is not something that precluded – I think I said before, actually, this is not something that precluded Mr. Morrison from obtaining DNA evidence. But the amendments in 2015 to this statute, they didn't eliminate a requirement or eliminate a bar either to applicants from getting DNA. Like I said before, this – the amendment that added discovery procedures to the statute was simply done to address the legislature's concern that they wanted to have a formalized procedure for discovery as opposed to just the routine discovery that occurs in trial courts. Counsel, I want to address for a moment something I talked to your opposing counsel about, and that is in an effort to demonstrate what they believe is the fundamentally inadequate provisions under the former version of 1405, counsel included – he said he could find only three cases that granted a 1405 motion. We checked on Westlaw. There were eight cases. Referring to that, if you include Morrison's case themself, what role, if any, should the statistical analysis provided by counsel play in our review of this case? Well, I think none, Your Honor. And in particular with respect to the statistics that were cited by appellant's counsel, it's a tricky business with statistics in the best scenario. And here you have to look at the baseline of what was surveyed. That's 14 out of 58 of the counties in California, which is from the get-go a very impartial and nonrepresentative sample. And then you have to look at what actually was surveyed, you know, what was available on the electronic dockets. So the notion that you can draw any conclusions that are reliable or reasonable with respect to how many motions were filed or denied is not supported in the record. And the other thing that's not – Do we have to rely on the record in the statistical analysis? And the reason I ask that is because in other parts here he cites things outside the State of California and so on and so on. But what do we do with statistics anyway? I mean, obviously you can make statistics say whatever you want. There's even a book to that effect. Right. That's a – What do we do with that? It's not in the record. Well, I mean, from a practical standpoint, it presents a real burden to district courts if every time you have a Section 1983 challenge to the way Section 1405 has been applied, you ask the district court to either hear evidence on or conduct a survey. And the problem here for Judge Cobello, if this issue were raised, and again, it was not raised below, is that you need to know the facts as to why each of these motions was denied. And, you know, if each of these motions were denied based on the reasonable probability standard or some other standard, you know, that would raise the second line of inquiry, which would then be why. And again, that's, you know, if they're denied, it may be for very good reasons. I mean, the reasons why we have the limitations in 1405 are because the legislature of this State, you know, just like the United States Congress, has acknowledged that you have to balance the interests between the prisoner and society's interests and the court's interests. And that's something that the legislatures have done here because they have these substantial concerns with a number of issues that if you have no limits, for example, if you lower the standard, as Appellant's Court is arguing, you have a flood of litigation. I mean, don't take my word for it. You can look at the Congress, which has enacted the Prison Litigation Reform Act, and the explicit purpose of that statute is to limit or stem the tide of frivolous claims by prisoners. But there's other issues as well. There's the cost to the courts. There's the time to the courts and to the public defenders and the district attorneys that are involved in these 1405 motions. And, you know, last but not least, there's the question of justice. When you have what is admittedly a needle in a haystack, when you have an innocent prisoner for whom DNA evidence has the potential to free them, to exonerate them, and you have a flood of litigation, this needle in the haystack becomes more and more difficult to find. It delays the lower standards that you have, the longer the delay is of justice for those who the very narrow class of convicts for whom this statute was intended to protect. And that's not Mr. Morrison in this case. I mean, if you want the archetypal example of a prisoner for whom this statute benefits, take, like, a single perp rape case with a shaky or nonexistent eyewitness identification and no other evidence. That's a case where if, for whatever reasons at the criminal trial, the defendant didn't want to do DNA testing, it would have the power to exonerate him or her. And in this case, it wouldn't, because the eyewitness IDs against Mr. Morrison in his trial, the physical evidence, I mean, it was all consistent, it was all aligned with the prosecution's theory, and it really, you know, when he's convicted beyond the shadow of a reasonable doubt, you know, what he's left with is a diminished liberty interest. And that's what is really at the core of this case, is that when you have a post-conviction remedy, the State courts are given tremendous, or I should say considerable flexibility in terms of how they protect the diminished liberty interest. And that's why in the Osborne case, I mean, if you line up what's the provisions, both the statutory and the constitutional three-part test in Osborne, with what we have here in California, there isn't a serious argument that California's procedures are not more generous, which is to say the barriers that Alaska had enacted with its nascent, you know, non-DNA-specific procedures, if those pass constitutional muster, it doesn't take long, and it didn't take Judge Koh and the district court below long, to conclude that, you know, the flexible concept of due process here, I mean, it was easily satisfied with 1405. I mean, there's so many things here in California that benefit the applicant for DNA testing that are not available in Alaska. Kennedy. Counsel, how should we treat the fact that the legislature did in fact amend the statute? As we analyze this, do we take that into account at all? Do we focus exclusively on the current, I mean, the law that existed when the lawsuit was filed? What do we do? This Court certainly does not need to give any consideration whatsoever to the amendments, because the issue before this Court is whether the prior version of 1405 violated due process either facially or as applied to Mr. Morrison. I mean, the unspoken but suggested notion that an amendment to a statute may acknowledge a constitutional infirmity is just wrong. And I think I've explained, you know, the source of the amendments and how they don't have any bearing on Mr. Morrison's position. You feel they were related to the earlier case, right? Correct. That is correct, Your Honor. Counsel, just out of curiosity, the statement was made by opposing counsel that this evidence is sitting in a locker. It would only take a couple days to get the test done and a couple hundred bucks. Is that in the record? There is no evidence in the record with respect to the cost that would be available or even the location. I'm assuming that it's at the Contra Costa County Superior Court or otherwise maintained by the district attorney's office. But the cost issue is a bit of a red herring. I mean, let's just assume for the sake of argument that in 2015, compared to 2006 when Mr. Morrison filed his first motion for testing, the cost has dropped or the efficiency of the testing has increased. That still has no bearing on the other substantial policy interests that the legislature has articulated in support of having limitations to DNA testing for convicted prisoners. And I've already articulated those policy interests to the Court, so I don't need to repeat those. Thank you, counsel. Anything further? No, there's none. I'm happy to submit if Your Honors have no more questions. Very well. Mr. Lipschitz, you have some reserved time. Thank you, Your Honors. I'm just going to address a couple of points made by opposing counsel. First, this notion that there's going to be this flood of litigation. The State Brief discusses how DNA testing has been a regular part of proof in criminal trials for at least the last decade. There aren't a huge number of prisoners out there who would be flooding the courts, as the defendant suggests. We're dealing with a unique circumstance here because this is a crime that took place 40 years ago, long before DNA testing was used. And so those are the kinds of cases that are out there. And, frankly, for the prosecutor or, excuse me, for the county to get up and say, oh, this is the kind of case, this rape case is the kind of case where we think DNA evidence would be appropriate, whereas this case that's at issue here is not the kind of case. That's the problem with the statute. You know, we cited these statistics, and, of course, the court can do whatever it wants or nothing at all with those statistics. But they are, you know, they are somewhat, in my mind, probative of what the type of evidence that could be put on it in front of the district court if we were allowed to get to that phase. And, notably, the State of California intervened in this appeal, filed a brief, did not dispute any of these statistics. Instead, what the State says is that it stands to reason that there would be very few successful contested Section 1405 motions, because when the prosecutor feels that testing DNA is a worthwhile endeavor, the prosecutor consents to it and turns over the evidence to the other side. Well, counsel, how do you respond to the county's argument that the counsel in the trial court argued in closing not his client didn't do it, but diminished capacity in self-defense, and DNA would really have no probative value with regard to those kind of claims? Well, that's never been Mr. Morrison's position. Mr. Morrison's position has always been that he didn't do it. I can't speak to what decisions his counsel made in closing arguments 40 years ago, but certainly the district court in this case did not view that as dispositive. It went forward and analyzed the facial constitutional challenge that Mr. Morrison is raising, so, and stated that, you know, that identity of the perpetrator was at issue in the case. Would that have anything to do with the Richardson standard, you know, in terms of the other witnesses, what was said in closing argument? Doesn't that all enter into whether or not this should go forward? Well, I think it enters into whether his 1405 petition, his particular 1405 petition was correctly granted under the Richardson's, was correctly denied under the Richardson standard, but it does not go, in my view, to the categorical nature of Section 1405 and whether it satisfies due process in the main of cases. And, you know, the district court here took Mr. Morrison at his word, and Mr. Morrison has maintained his innocence for 40 years. He believes very strongly that, you know, two dudes, as my opposing counsel put it, committed this crime. And, frankly, the testimony at trial, there were lots of witnesses that say they saw Mr. Morrison do it, but they were drive-by witnesses. This was an African-American male of average height and average build, lots of people who actually watched the whole crime take place from start to finish. And so this is the kind of case where DNA evidence would shed light on Mr. Morrison's claim that he's been innocent for 40 years. Thank you, counsel. Before submitting the case, I want to say on behalf of the Court that we very much appreciate CJA counsel taking this case and the fine arguments on both sides that help us resolve this case. Thank you very much. Thank you, Your Honor. The case just argued will be submitted, and the Court will adjourn.
judges: O'scannlain, M. Smith, Morris